IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

DANIEL KEITH LOLLEY,         :

     Plaintiff,         :

vs.                 :     CIVIL ACTION 09-00555-CG-B

LOUISIANA CORRECTIONAL     :
SERVICES,

                     :

     Defendant.

                     :

## REPORT AND RECOMMENDATION

Plaintiff, an Alabama prison inmate proceeding pro se and in forma pauperis, filed a Complaint under 42 U.S.C. § 1983. This action was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.2(c)(4), and is now before the undersigned on Defendant Louisiana Correctional Services ("LCS")'s Motion for Summary Judgment and supporting materials (Docs. 20, 21, 31), and Plaintiff's response and materials in opposition. (Docs. 28, 29). Upon consideration of the briefs and supporting materials, and for the reasons set forth below, it is recommended that Defendant's motion be granted on all claims except Plaintiff's claim regarding lack of ceremonial grounds at the Perry County Correctional Center.

## I. <u>FACTUAL ALLEGATIONS</u>

From its review of the record, the Court summarizes the parties' allegations which are material to the issues addressed in this Report and Recommendation.

At all times relevant to this action, LCS, a private corporation, operated the Perry County Correctional Center ("PCCC" or "Correctional Center") through a contract with the Alabama Department of Corrections ("ADOC"). On August 6, 2009, a routine shakedown was conducted at the Correctional Center. (Doc. 20 at 1). Plaintiff, who was incarcerated at the facility at the time, alleges that during the shakedown, his Native American religious items were mishandled. (Doc. 1 at 3).

Specifically, Plaintiff alleges that he is a "federally recognized sub-chief for the Brothers-in-Tears Warrior Society Of Logan, AL, Principal Chief Melody Little Deer", and that on the night of August 6th, "two unidentified [PCCC] Officers, woke inmate Lolley up at approximately 10:08 p.m., for routine shakedown." (Doc. 4 at 4-6). According to Plaintiff, he asked the officers if they were trained to handle religious objects according to the Alabama Department of Corrections ("ADOC"), Admin. Reg. #333[1], and explained that if they were not

---

[1] Admin. Reg. No. 333 contains the ADOC policies and procedures for recognition of religious beliefs and practices of committed offenders. According to Warden Mullins, guards at (Continued)

2

appropriately trained they could not handle the objects. (Doc. 4 at 4). Allegedly, one of the officers remarked to his partner "not to worry about that shit, and move on" at which point his partner "reached in [the] locker box, and took [the] Native American sacred item box, . . . tossed the Sacred Item box on the bed above ..., laughed at [Plaintiff], and then moved some of [the] sacred items around in the box" before leaving. (Doc. 4 at 5)[2]. According to Lolley, his medicine bag was inside his sacred item box. (Doc. 4 at 5).

Following the incident, Lolley filed an offender request form wherein he asserted that "Officer mishandled Native American Sacred item box and thinking it was a joke". (Doc. 29-1 at 7, Ex. C). Lolley met with prison officials to discuss the incident and during the meeting, Lolley informed Warden Mullins that he needed to order herbs in order to purify his sacred item box which had been desecrated. According to Lolley, Warden Mullins directed him to submit a request form for the herbs, and

---

PCCC are advised and instructed on this regulation. (See affidavit of Warden Mullins, Doc. 31, Ex. B at 2).

[2] Lolley gives conflicting accounts as to whether or not the officer actually touched anything in the sacred box. In Lolley's "Statement" (Doc. 29-1), he states that the officer who grabbed his box told the other officer, "man I aint opening that it might be some voodoo []," before placing the box on the top rack and leaving. (Doc. 29-1 at 1-2).

indicated that he would review the cameras. (Doc. 28 at 2-3). A week later, Warden Mullins provided Lolley a letter to show guards in order to protect his property. (Doc. 21-2 at 1; Doc. 4 at 5).

On September 29, 2009, Lolley was transferred from PCCC to Staton Correctional facility. (Doc. 7 at 1). According to Lolley, he was transferred for the purpose of "Sweat Lodge Ceremonies"; however, he missed out on the Fall Equinox ceremonies. (Doc. 9 at 1). On March 17, 2010, Lolley was transferred back to PCCC approximately one week before the "Spring Equinox ceremonies." (Id.). During a discussion with Warden Mullins following his return to PCCC, Lolley requested to be transferred from the PCCC facility. At Mullins' request, Lolley submitted his transfer request on the offender request form on May 4, 2010. Mullins in turn forwarded the request to the Assistant Commissioner of ADOC, and Lolley was transferred from PCCC on May 7, 2010. (Doc. 31-2, Doc. 11)).

## II. Procedural History

Lolley filed his initial Section 1983 Complaint on August 27, 2009, and named LSC, Perry County Correctional Center, and Officer "John Doe" as Defendants. (Doc. 1). Because neither Lolley's Complaint nor his accompanying Motion to Proceed Without Prepayment of Costs were on this Court's required forms, he was directed to re-file his Complaint and motion on the

Court's current forms.   Lolley was instructed that the amended complaint would supersede his original Complaint. (Doc. 3).   In response to the Court's Order, Lolley subsequently filed, on September 16, 2009 an Amended Complaint (Doc. 4), and named Louisiana Correctional Services and "John Doe" as Defendants. In his Amended Complaint, Plaintiff details the events of August 6, 2009 involving the alleged inappropriate handling of his sacred items.   Plaintiff also alleges:

> I am not allowed to have herbs sent into purify my Items, nor is there a Native American Ceremonial Grounds at Perry Co. Corr. Fac., nor have we been given an area to worship without disturbance from other inmates.

(Doc. 4 at 5).   Lolley requests $50,000 in punitive damages, and to be returned to Staton Correctional facility. (Doc. 4 at 9).

On April 7, 2010, Lolley filed a document entitled "Supplement to Case Number 09-00555-CG-B", and made additional allegations as follows:

> On August 21, 2009, ADOC Inmate Daniel, filed a law suit under 42 USC § 1983 for violations against said inmate of Desecration of Sacred items, no Native American Grounds with sweat lodge, at The Perry County Correctional Center.

> On September 29, 2009, Inmate Lolley was transferred back to Staton Correctional Facility for the purpose of "Sweat Lodge Ceremonies." This was after missing out on the Fall Equinox ceremonies.

5

On March 17, 2010 Inmate Lolley was transferred back to Perry County Correctional Center. This occurred one week before the 'Spring Equinox' ceremonies. Inmate Lolley is currently assigned to the same where conditions are unchanged and therefore violate his rights and several Administrative regulations and places Lolley in danger as he had verbal confrontations with several unidentified corrections officers that almost lead to a physical altercation. This violate Administrative Regulation #208 page 5 of 34 section c number 5, which states, "Employees shall not abuse inmates in any manner."

(Doc. 9 at 1). Lolley also asserts that Regulation No. 333 requires that any institution that houses Native American inmates have a 20' x 20' ceremonial ground and that such inmates be transferred to one of the four institutions having sweat lodges in order to participate in sweat ceremonies. (Id. at 2) In addition, Plaintiff asserts that officer Carter, the third shift officer at the Staton Correctional Facility, advised him that if he packed up all his Native American items, they were going to go into Lolley's property and remove all such items. According to Lolley, this violated ADOC Administrative Regulation #333 section dealing with "Retention of Religious items". (Id. at 1-2). Lolley also asserts that his transfer in July 2010 deprived him of his right to take part in ceremonies that are intrinsic to his religious beliefs, constituted a violation of the first and fourteenth amendments to the U.S.

Constitution, and deprived him of his religious freedom.[3] (Id. at 2).

Lolley filed a second Addendum and Supplement on April 16, 2010, and therein advises of his desire to add Alabama DOC Prison Commissioner Richard Allen, Alabama DOC Director of Central Records Caroline Golson, and Staton Correctional Facility Third Shift Officer Carter as Defendants. Lolley also regurgitates the allegations contained in his April 7th filing. (Doc. 10).

---

[3] In his various pleadings, Lolley has alleged that LCS violated his right to practice his religion under the First and Fourteenth Amendments. While it is well settled that "the courts may not serve as de facto counsel for the litigant or rewrite an otherwise deficient pleading in order to sustain an action", pro se litigants, such as Lolley, are entitled to have their pleadings construed liberally. See Erickson v. Pardus, 551 U.S. 89, 94, 127 S. Ct. 2197, 167 L.ed. 2d 1081 (2007); Sec'y, Fla. Dept. of Corr. v. Baker, 406 Fed. Appx. 416, 422 (11th Cir. 2010). And, if they present substantive elements of a claim and argue all but the label one might otherwise use to identify the claim, then courts may recognize them. Id. at 422. The undersigned recognizes that the Religious Land Use and Institutional Persons Act ("RLUIPA"), imposes duties on prison officials that exceed those imposed by the First Amendment. See Jova v. Smith, 582 F. 3d 410, 415 (2nd Cir. 2009). However, after a review of Plaintiff's various pleadings and briefs in this case, the undersigned finds that Plaintiff was well aware of RLUIPA when he initiated this action. He cites to the statute in a letter that he sent to the Alabama Department of Correction, a copy of which he submitted as an exhibit in this case. (Doc. 29-1 at 5). Despite Lolley's awareness of RLUIPA, he did not cite or reference RLUIPA in his Amended Complaint, supplements or briefs filed with this Court.  Accordingly, the undersigned finds that no RLUIPA claim is before the Court.

During the screening process conducted pursuant to 28 U.S.C. § 1915 (e)(2)(B), the Court determined that Lolley failed to provide sufficient identifying information with respect to either John Doe I or John Doe II; thus, the claims against those defendants were dismissed without prejudice as frivolous. (Doc. 13 at 5). The Court also found that because Lolley merely mentioned the names of Commissioner Allen and Director Golson, but did not describe what either was alleged to have done to violate his constitutional rights, those claims were subject to dismissal for failure to state a claim; thus, the proposed amendment was denied as futile. (Doc. 13 at 8-9). Additionally, because Lolley's proposed claim against Officer Carter involved an incident that allegedly took place at a different facility in Elmore County, which is not in this judicial district, and involved facts separate and apart from the nucleus of facts alleged to have occurred at PCCC, Lolley's claim in this regard was subject to dismissal; thus, was denied as futile. (Doc. 13 at 9-10).

Defendant filed its Answer and Special Report on July 19, 2010. (Docs. 20, 21). Defendant denied all allegations of wrongdoing, and pleads immunity under any and all state and federal laws. (Doc. 20). In an Order dated November 29, 2010 (Doc. 24), Defendant's' Special Report and Answer were converted into a Motion for Summary Judgment, and the parties were

provided notice and an opportunity to submit briefs and other
materials in support or in opposition to the motion. (Doc. 24).
In response to the Court's Order, Defendant filed a Brief in
Support of Motion for Summary Judgment (Doc. 25), and Plaintiff
filed a "Response to Defendant's Answer" (Doc. 28) and "Follow
Up" (Doc. 29), which contained additional exhibits including
five sworn affidavits in support of Plaintiff's claims[4]. After

---

[4] In Lolley's Affidavit in response to Defendant's Summary
Judgment motion, he seeks to assert new claims. Specifically,
he alleges that Native American inmates are treated less
favorably than Baptist, Christian, and Muslim inmates at PCCC,
and that Warden Mullins retaliates against inmates who file
grievances by transferring inmates, firing inmates from paying
jobs, revoking law library passes and even depriving them of
extra time in the law library. (Doc. 24 at 20).  With the
exception of Lolley's claim regarding his 2010 transfer back to
PCCC, the other claims are not properly before the Court because
Lolley sought to raise them for the first time in his response
to Defendant's summary judgment motion, and  he  has offered no
probative facts in support of the conclusory allegations. The
law in this Circuit is clear that while "a federal court must
liberally construe pro se pleadings, Albra v. Advan, Inc., 490
F. 3d 826, 829 (11th Cir. 2007), such standards do "not afford
Plaintiffs with an opportunity to raise new claims at the
summary judgment stage."" Mortensen v. Mortgage Electronic
Registration Systems, Inc., 2010 U.S. LEXIS 135876 (11th Cir.
2011); Gilmour v. Gates, McDonald and Co., 382 F. 3d 1312, 1314
(11th Cir. 2004)(at the summary judgment stage, the proper
procedure for plaintiffs to assert a new claim is to amend the
complaint in accordance with Fed. R.Civ.P. 15(a).  A plaintiff
may not amend h[is] complaint through argument in a brief
opposing summary judgment."); Joiner v. Mason, 2011 U.S. Dist.
LEXIS 55580 (M.D. Ala. May 23, 2011)("To the extent plaintiff
presents new claims for relief or factual allegations,
additional defendants and or additional theories of liability in
his opposition to defendants' dispositive motion, such claims
are not properly before the Court nor did the court consider
Plaintiff's opposition as an amendment to his complaint.);
(Continued)

reviewing the pleadings, the Court ordered additional briefing from Defendant addressing 1) the circumstances under which LCS operates PCCC, and 2) the circumstances surrounding Lolley's March 2010 transfer to PCCC. (Doc. 30). All issues relating to the Summary Judgment motion have now been fully briefed, and the motion is now ripe for resolution.

### III. SUMMARY JUDGMENT STANDARD

In analyzing the propriety of a motion for summary judgment, the Court begins with these basic principles. The Federal Rules of Civil Procedure grants this Court authority under Rule 56 to render "judgment as a matter of law" to a party who moves for summary judgment.  "[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact….'" Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).

The Court must view the evidence produced by "the nonmoving party, and all factual inferences arising from it, in the light most favorable to" that party.  Barfield v. Brierton, 883 F.2d

---

Bethel v. City of Mobile, 2011 U.S. Dist. LEXIS 36972 (S. D. Ala. April 5, 2011)("The law in this circuit is clear that plaintiffs are not permitted to raise new claims in response to a defendant's motion for summary judgment.)

923, 934 (11th Cir. 1989).  However, the Court is only to "make all *reasonable* inferences in favor of the party opposing summary judgment . . . not to make all *possible* inferences in the nonmoving party's favor."  Torjagbo v. United States, 285 Fed. Appx. 615, 619 (11th Cir. 2008) (emphasis in original).

> Rule 56(e)(2) states that:
>
> > [w]hen a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial.  If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

Fed. R. Civ. P. 56(e).

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. . . .  If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (internal citations omitted). "Summary judgment is mandated where a party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  Custom Mfg. & Eng'g, Inc.

v. Midway Servs., 508 F.3d 641, 647 (11th Cir. 2007) (citations omitted).

In a civil action filed by an inmate, although drawing "all justifiable inferences in [the inmate's] favor," federal courts

> must distinguish between evidence of disputed facts and disputed matters of professional judgment.  In respect to the latter, our inferences must accord deference to the views of prison authorities.  Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

Beard v. Banks, 548 U.S. 521, 529-30 (2006) (internal citation omitted).  "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is "no genuine issue for trial."'"  Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

**IV. ANALYSIS**

The evidence before the Court establishes that LCS is a privately owned entity that operates the PCCC prison facility. (Doc. 31-1, Ex. A at 3).  Through a contract with ADOC, LCS houses Alabama prison inmates at the PCCC facility from time to time. (Id. at 15).  A private entity that contracts with the government to run prisons or units thereof fulfills a role traditionally occupied by the state, and as a result, the

private entity becomes the functional equivalent of a municipality and thus, act under color of state law for purposes of § 1983. *See* Farrow v. West, 320 F. 3d 1235 (llth Cir. 2003). A private entity performing a public function becomes liable under § 1983 where it has a policy or custom that deprives an individual of rights guaranteed under the constitution. Buckner v. Toro, 116 F. 3d 450 (llth Cir. 1997); German v. Broward County Sheriff's Office, 315 Fed. Appx. 773 (llth Cir. 2009). A plaintiff can establish the existence of a policy or custom by showing that the constitutional deprivations were persistent and widespread. Depew v. St. Marys, 787 F. 2d 1496, 1499 (llth Cir. 1986). In other words, private entities cannot be held liable under Section 1983 on a respondent superior vicarious liability basis. Monell v. Dept. of Soc. Servs., 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978); Harvey v. Harvey, 949 F. 2d 1127, 1129-310 (llth Cir. 1992); Lord v. Richmond County Jail, 2011 U.S. Dist. LEXIS 5887 (S.D. Ga. Jan. 20, 2011)(jail could not be vicariously liable for alleged constitutional violations regarding inadequate medical care at the jail); Nesmith v. Corrections Corp. of America, 2007 WL 2453584 (S.D. Ga. Aug. 23, 2007).

## A. Desecration of Religious Items

As a preliminary matter, Lolley has not alleged, much less shown, that the mishandling of his religious items occurred

pursuant to a custom or policy promulgated by LCS. As noted supra, the undisputed evidence in this case shows that on or about August 6, 2009, a routine "shakedown" was performed at Perry County Correctional Center where Mr. Lolley was being housed. According to Lolley, his items, specifically a sacred item box containing his medicine bag, were mishandled by an unidentified PCCC guard during the search of his bunk area in violation of his First and Fourteenth Amendment rights. Both parties agree that within a week of the incident, Deputy Warden Mullins provided Lolley with a letter notifying officers that Lolley's religious items were not to be touched. (Doc. 31, Ex. 9 at 3; Doc. 1 at 3). Viewing these facts in the light most favorable to Lolley, they fail to demonstrate the existence of a genuine issue of material with respect to whether LCS had a policy or custom which led to the alleged violations of Lolley's constitutional rights, or whether there was "a history of widespread abuse" regarding the mishandling of Native American religious items at PCCC. In fact, Lolley has not asserted and the record is devoid of any evidence that suggests that there were any subsequent incidents at PCCC involving the inappropriate handling of Lolley's sacred items. Additionally, Lolley has brought forth no evidence demonstrating that similar

incidents have occurred previously at the facility.[5]  Moreover, LCS's contract with ADOC requires that it adhere to ADOC's Religious Program Services guidelines, including those regarding "Training of Correctional Officers on Inspections" and "Sacred Item Box"[6].  (See Doc. 31, Ex. A, F at 22).

---

[5] Plaintiff has provided the court with four (4) affidavits submitted by other prisoners who have been housed at PCCC. However, none of these speak to the mishandling of religious items.

[6] Specifically, the relevant parts of the guidelines provide as follows:

> 18) <u>Training of Correctional Officers on Inspections</u>: ADOC officials shall be taught the proper procedures for inspecting and viewing all Native American items. Specifically, the ADOC shall train its personnel not to touch the medicine bags or sacred pipes of the Native American inmates. Should an officer believe that it is necessary to inspect the contents of a Native American's medicine bag or sacred pipe, the officer shall bring the inmate to the Chaplain's office where the contents of the bag or pipe can be visually inspected. In the event the Chaplain is not present, the inspection may be performed in the presence of the Shift Commander.

> . . . .

> 20)) <u>Sacred Item Box</u>: The ADOC shall not prohibit Native American inmates from maintaining a sacred item box in their personal possession so long as the size of such box allows it to be kept within the inmate's locker box or personal possessions.

(Doc. 21-1 at 16-17).

(Continued)

Also, while Lolley contends that his rights were violated by the officers mocking him during the August 6th incident, the record does not contain any evidence that suggests, let alone demonstrates, that LCS has a policy, custom, or a significant history of employees mocking inmates based on their religious beliefs. Plaintiff's assertion that the PCCC officers considered the desecration of his items to be a "joking matter," is at best one instance of employee misconduct. (Id.). In the absence of evidence of a policy or custom or wide spread abuse, this claim is due to be dismissed.

Assuming *arguendo* that Lolley had proffered evidence of a policy or custom, his claim would still fail. Although "prisoners do not shed all constitutional rights at the prison gate,…[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights. <u>Sandin v. Conner</u>, 515 U.S. 472, 485, 115 S. Ct. 2293, 2301, 132 L. Ed. 2d 418 (1995)(citations and quotation marks omitted). A prison regulation, even though it infringes the inmate's constitutional rights to some degree, is an actionable constitutional violation only if the regulation is unreasonable using the four factors set forth in the Supreme Court's <u>Turner v. Safley</u>, 482 U.S. 78,

1075 S. Ct. 2254, 96 L. Ed. 2d 64 (1987) decision[7]. Id.  Thus, inmates retain the right to free exercise of religion subject to prison regulations consistent with the Turner reasonableness standard.

Viewing the facts in the light most favorable to Lolley, he has not established an actionable constitutional claim.  The facts establish that his sacred item box was not confiscated, but was briefly mishandled by an officer during an official prison shakedown.  "Such searches, even of religious property, are reasonably related to a legitimate penological interest, i.e. security, as a matter of law," and do not violate the Turner v. Safley, standard for first amendment violations. Caldwell v. Folino, 2009 U.S. Dist. LEXIS 56838, 26* (W.D. Penn. June 30, 2009)(vacated and remanded on other grounds). Even in cases where inmates are actually deprived of their religious

---

[7] The "reasonableness" test set out in Turner v. Safley, 482 U.S. 78, 89, 107 S. Ct. 2254, 96  L. Ed. 2d 64 (1987), examines four factors: (1) whether the regulation or practice in question furthers a legitimate governmental interest unrelated to the suppression of expression, (2) whether there are alternative means of exercising First Amendment rights that remain open to prison inmates; (3) whether the right can be exercised only at the cost of less liberty and safety for guards and other prisoners, and the effect on prison resources in general; and (4) whether an alternative exists which would fully accommodate the prisoners' rights at de minimis cost to valid penological interests.

items temporarily, courts have consistently held that temporary deprivation does not amount to a constitutional violation. See, e.g., Marsh v. Corr. Corp. of Am., 134 F.3d 383, 1998 WL 31435, at 3* (10th Cir. 1998)(concluding plaintiff's allegations that defendants temporarily deprived her of religious items for fifteen days failed to satisfy her burden of establishing a First Amendment violation); Fillmore v. Eichkorn, 891 F.Supp. 1482, 1493 (D. Kan. 1995)(finding denial of arrestee's religious requests for cotton clothing, distilled water and a Holy Bible over a weekend did not establish constitutional violation), affd, 77 F.3d 492 (10th Cir. 1996); McCroy v. Douglas County Corrections Center, 2010 U.S. Dist. LEXIS 38643 (D. Neb. 2010)(prisoner did not state a claim for relief where his religious items were confiscated during a shakedown and then returned 15 days later after prisoner filed a grievance form).

Plaintiff also alleges that the touching of his sacred item box violated ADOC Administrative Regulation #333, and his rights under the Fourteenth Amendment. The due process clause of the Fourteenth Amendment provides that "[n]o state shall . . . deprive any person of life, liberty or property without due process of law…." U.S. Const. Amend. XIV, § 1. Therefore, in addition to the requirement that there must be a protected right, there must also be a deprivation of that right before a court needs to address the constitutional adequacy of the

procedure accompanying that deprivation.   In this case, Lolley has not alleged, let alone demonstrated that he was deprived of his sacred item box.   Accordingly, in the absence of a deprivation, he cannot establish a claim under the Fourteenth Amendment.

### B. Deprivation of Herbs

Plaintiff also alleges that he was "not allowed to have herbs sent in to purify [his] items" following the shakedown. (Doc. 4 at 5).  Specifically, Plaintiff claims that at a meeting with prison officials following the shakedown on August 6, 2009, he advised officials that he needed herbs to purify his sacred item box because it had been desecrated, and he was advised to submit a request form.  (Doc. 28 at 3).  Defendant contends that PCCC does allow inmates to order herbs if they make an official request.  (Doc. 21 at 2). While Lolley contends that he was deprived of possessing herbs, he has not alleged and the record does not reflect that he submitted the request form as directed. Indeed, the record is undisputed that the Correctional Center has in place a grievance mechanism to handle inmate concerns and requests. (Doc. 31-3, Ex. C).  It is clear that Lolley was familiar with the procedure given the fact that he submitted an inmate request form regarding the mishandling of his sacred item box, and as a result, he was afforded a meeting with prison

officials to discuss the incident, and was provided a letter from the Warden advising officers about touching his sacred item box. Because Lolley has presented no evidence that he submitted the request form as directed, he cannot establish that he was improperly denied herbs.

## C. Unlawful transfer

Lolley also alleges that his "second transfer to Perry County Correctional Center Facility, which occurred on [March] 17, 2010, one week before 'Spring Equinox Sweat Lodge' ceremonies . . . deprived [him] of his right to take part in the ceremonies that are intrinsic to his religious beliefs."[8] (Doc. 9 at 2). According to Lolley, this deprivation violated his first and fourteenth amendment rights, as well as his rights as an Alabama Department of Corrections inmate. (Id.). Lolley also appears to argue that the transfer was in retaliation for the instant lawsuit[9]. However, Lolley has not demonstrated a causal

---

[8] The Court notes that in Plaintiff's "Supplement" he also alleged that "Officer Carter" at Staton Correctional Facility would not allow him to pack up his Native American items for transfer. The Court's earlier Report and Recommendation (Doc. 13) dismissed this claim.

[9] To establish a retaliation claim, a plaintiff must establish that his act was constitutionally protected, that the defendant's retaliatory conducted had an adverse affect, and that a causal connection exists between the retaliatory act and the adverse affect. Douglas v. Yates, 535 F. 3d 1316, 1321 (11th Cir. 2008).

connection between the actions of LCS and his transfer back to PCCC in March 2010. The uncontested evidence establishes that LCS, pursuant to its agreement with ADOC, houses Alabama inmates selected by ADOC at the PCCC facility. According to LCS, it is ADOC, as opposed to LCS, who decides where to place inmates. When an inmate housed at PCCC requests a transfer, the Warden at PCCC helps to facilitate the transfer by relaying the request to ADOC. (Doc. 31 at 1). LCS does not have any control over where an inmate in placed once he is moved from the PCCC facility.

Prison records indicate, and both parties confirm, that Lolley initially arrived at PCCC on July 17, 2009, and was released to the Staton facility on September 29, 2009[10]. Lolley was transferred back to PCCC on March 17, 2010. According to Lolley, due to the transfer, he missed the Spring Equinox ceremony, which was to be held a week later at Staton Correctional facility.[11] (Doc. 9 at 1). Lolley has not alleged

---

[10] To the extent Lolley is claiming that his transfer to Staton in September 2009 was somehow retaliatory, his claim must fail as transfer from PCCC to a facility with a sweat lodge, which Staton possesses, is the very relief Lolley requested when he filed this lawsuit.

[11] The Spring and Fall Equinox ceremonies practiced by the Native American religion are recognized by the ADOC as two of the four events requiring "sweat ceremonies." (Doc. 31, Ex F. at 19). Sweat ceremonies, necessary for purification, are performed in a sweat lodge structure, defined as "a dome shaped structure constructed with willow or other saplings indigenous to the (Continued)

21

and the record does not reflect that LCS played any role in the decision to transfer Lolley back to PCCC in March 2010. LCS has however presented evidence that when Lolley advised Warden Mullins of his desire to be transferred from PCCC, Lolley was directed to complete an offender request form, and upon him doing so on May 4, 2010, Warden Mullins acted promptly in passing Lolley's request along to ADOC officials, who effectuated the transfer. On May 7, 2010, Lolley was transferred back to Staton, via a short stop-over at Bibb County Correctional Center, so that he could participate, per his request, in the next sweat ceremony which was to be held at Staton on June 21, 2010. (See Doc. 29-1, Ex. N; Doc. 31, Ex. D at 2)[12].

As discussed above, Plaintiff has failed to establish a causal connection between LCS and his transfer back to PCCC in March 2010.  The evidence instead establishes that while LCS played no role in the decision to transfer Lolley back to PCCC in March 2010, when LCS became aware of Lolley's request to transfer to a facility with a sweat lodge, it acted promptly in

---

area." Staton has a sweat lodge structure which accommodates these ceremonies. PCCC is not a designated sweat lodge facility.

[12]  Lolley filed a Notice of Address Change dated May 17, 2010.  On the form, he lists the Staton Correctional facility as his new address. (Doc. 12).

facilitating the request upon receipt of his offender request form. Accordingly, Lolley has failed to present evidence establishing a genuine issue of material fact on this claim; thus, summary judgment is appropriate.

### D. Ceremonial Grounds, Sweat Lodge, and Worship Services

Plaintiff has also alleged that PCCC does not allow for Native American worship without disturbance from other inmates, and does not have ceremonial grounds or a sweat lodge for Native American inmates in violation of his First Amendment right to free exercise of religion, as well as ADOC Administrative Regulation #333. (Doc. 1 at 4-5; Doc. 4 at 5). Defendant contends that while the PCCC facility does not have a sweat lodge; ADOC has four designated facilities which have sweat lodges and that Native American inmates who desire to take part in the sweat lodge ceremony can request to be transferred to one of the designated facilities. (Doc. 21 at 2; Doc. 31, Ex. B at 2).

In considering whether a facility must provide a sweat lodge or other Native American ceremonial grounds, the Turner First Amendment analysis requires a balancing of the Constitutional interests of the confined with the legitimate safety concerns of the specific institution. Newberg v. Geo Group, Inc., 2011 U.S. Dist. LEXIS 68955, *26, n. 9 (M.D. Fla. June 27, 2011); *See also* Allen v. Toombs, 827 F.2d 563, 567

23

(finding no First Amendment violation where concerns for security are reasonably related to denial of access to a sweat lodge); <u>Fowler v. Crawford</u>, 534 F.3d 931 (8th Cir. 2008)(finding prisoner did not have a right to a sweat lodge under RLUIPA given security concerns).   Courts addressing sweat lodges have determined that sweat lodges, which involve a ceremony with an open fire, and access to an unobservable area, create significant safety concerns.   <u>Newberg</u>, 2011 U.S. Dist. LEXIS 68955 at 33-34, n. 12.

In this case, the evidence reflects that ADOC's regulations[13] provide for four designated prison institutions to

---

[13] The ADOC guidelines provide, in pertinent part, as follows:

> <u>Size of Ceremonial Grounds</u>: Native American inmates shall be allowed to have and maintain a ceremonial ground at each institution where Native American inmates are incarcerated. The size and location of the ceremonial grounds is to be determined by factors such as: the specific institution, the availability of space, the level of security, and the number of Native American inmates wanting to use said ceremonial grounds. All ceremonial grounds shall be a minimum of 20' X 20.'
>
> . . . .
>
> <u>Location of Ceremonial Grounds</u>: Any correctional institution which has Native American inmates, shall have an area designated for use by them as ceremonial

(Continued)

24

maintain a "Sweat lodge structure", that PCCC is not one of the designated facilities, and that under ADOC's regulations, Native American inmates who desire to participate in sweat ceremonies can transfer to a designated facility. The evidence further demonstrates that when Lolley submitted the offender request form in May 2010 requesting transfer to a facility with a sweat lodge, LCS promptly forwarded the request to ADOC officials, and shortly thereafter, Lolley was transferred to Staton Correctional facility, which all agree has a sweat lodge. (Doc. 31, Ex. D at 2; Doc. 12). Additionally, the inmate affidavits submitted by Lolley confirm that LCS has also helped to facilitate transfer requests from other inmates desiring to

---

> grounds. Factors for determining the exact location of the grounds are as follows: Judgment of ADOC officials for the most appropriate place for the ceremonial grounds, the security level of the institution, the normal operation of the institution, and flow of inmate traffic at the institution.
>
> . . . .
>
> Sweat Lodge Institutions: The ADOC will designate four institutions to contain a Sweat Lodge Structure………. *The ADOC will follow the classification procedures to allow Native American inmates who desire to participate in sweat ceremonies to transfer to a designated institution.*

(Doc. 21-1 at 14, 19).

transfer from PCCC to a designated facility with a sweat lodge. Accordingly, the record before the Court fails to establish that providing Lolley with the opportunity to transfer to a designated facility with a sweat lodge placed an unreasonable restraint on his ability to practice his religion under the First Amendment. Thus, this claim fails.

As noted supra, Lolley also claims that at PCCC he was not able to worship without disturbance from other inmates, and that the facility does not have ceremonial grounds. While Lolley contends that PCCC does not allow for Native American worship without disturbance from other inmates, he has failed to proffer any facts in support of this claim. Simply put, aside from his conclusory allegations, Lolley has not proffered any facts which identify any specific instances in which other inmates disrupted or interfered with the worship services of Native American inmates at PCCC. Because the record is totally devoid of any probative evidence to support this claim, it is due to be dismissed. Harris v. Ostrout, 65 F.3d 912, 916 (11th Cir. 1995)(grant of summary judgment appropriate where inmate produces nothing beyond "his own conclusory allegations" challenging actions of defendants.).

Plaintiff's claim with respect to lack of ceremonial grounds at PCCC requires further inquiry. Lolley claims that while housed at PCCC, the facility did not have ceremonial

grounds for Native American inmates although ADOC Administrative Regulation No. 333 requires that all facilities housing Native American inmates have ceremonial grounds. Additionally, Plaintiff has submitted the declarations of Steven D. Latham, Charles A. Lee, and James Gay, each of whom alleges that while housed at PCCC for various periods between March 5, 2009 and May 7, 2010, no ceremonial grounds existed. (Doc. 29-1, Exs. D, E, G). According to James Gay, prison officials promised to work on providing ceremonial grounds, but no ceremonial grounds existed as of November 27, 2009. (Doc. 29-1, Ex. G at 16). In response to Lolley's showing, LCS asserts that ceremonial grounds exist at PCCC. Because PCCC's response does nothing more than take a position that is contrary to Lolley's claim[14], the undersigned finds, based on the existing record, that a genuine issue of material fact exists with respect to whether the PCCC had ceremonial grounds during the relevant time period.

**E. Relief Requested**

**1. Injunctive Relief**

---

[14] LCS has not alleged that Lolley did not exhaust his administrative remedies with respect to this claim although it is not clear from the record that Lolley did so, nor has LCS produced evidence reflecting that ceremonial grounds did in fact exist at PCCC during the relevant time period. Additionally, Defendant has not demonstrated that contrary to Lolley's assertion, ceremonial grounds are not necessary for the free exercise of his religion.

To the extent Lolley is seeking injunctive relief with respect to his claims regarding sacred herbs, worship services, ceremonial grounds, and his request for a transfer to Staton Correctional facility, his claims are moot. As noted supra, Lolley was transferred, per his inmate offender request, to Staton Correctional Facility in May of 2010 (Doc. 12), and is no longer subject to the policies that allegedly burdened his constitutional rights[15]. See County of Los Angeles v. Davis, 440 U.S. 625, 631, 99 S. Ct. 1379, 59 L. Ed. 2d 642 (1979); See also, Saleem v. Evans, 866 F.2d 1313, 1316 (11th Cir. 1989)(per curiam)("[T]he district court correctly concluded that [prisoner's] claim for injunctive relief against the warden … is moot because [he] is no longer incarcerated at WCI.");Cotterall v. Paul, 755 F.2d 777, 780 (11th Cir. 1985) (past exposure to even illegal conduct does not in and of itself show a pending controversy regarding injunctive relief); Mauwee v. Donat, 407 Fed. Appx. 105, 107 (9th Cir. 2010) ("The district court properly concluded that Mauwee's claims for injunctive relief were moot because the record indicates that he is no longer subject to the policies that allegedly burdened his free exercise rights.")(citing Darring v. Kincheloe, 783 F.2d 874, 876 (9th

---

[15] According to LCS, no ADOC inmates are currently housed at PCCC. (Doc. 31-2, Ex. B at 1).

Cir. 1986)(after an inmate is transferred, there is neither a 'reasonable expectation' nor a 'demonstrated probability' that the inmate will return to the prison against which he sought injunctive relief and therefore claim for injunctive relief is moot).

### 2.   Punitive Damages

Even if Lolley has raised a triable issue under the First Amendment, he is not entitled to punitive damages, as requested. (Doc. 4 at 9). The law in this Circuit is firmly established that the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(e), precludes the recovery of punitive damages in the absence of physical injury. Al-Amin v. Smith, 637 F.3d 1192, 1199 (11th Cir. 2011)(citing Harris v. Garner, 190 F.3d 1279, 1290 (11th Cir. 1999); Napier v. Preslicka, 314 F.3d 528, 534 (11th Cir. 2002); Smith v. Allen, 502 F.3d 1255, 1271 (11th Cir. 2007)).  It is further established that the PLRA physical injury requirement applies to constitutional claims, and is not dependent on a plaintiff pleading a "mental or emotional injury." Al-Amin, 637 F.3d at 1197-98. Plaintiff Lolley has not plead a physical injury in this case nor has he presented any evidence indicating a physical injury. Accordingly, Plaintiff's claims for punitive damages must be dismissed. Id. (upholding district court's dismissal of first amendment punitive damages claims based on the PLRA physical injury requirement).

## V. CONCLUSION

Based on the foregoing, it is recommended that Defendants' Motion for Summary Judgment be **GRANTED** with respect to Plaintiff's claims regarding desecration of religious items, deprivation of herbs, transfer to PCCC, lack of sweat lodge, and worship services, and his request for injunctive relief and punitive damages, and be **DENIED** with respect to Plaintiff's claim regarding lack of ceremonial grounds.

The attached sheet contains important information regarding objections to this recommendation.


DONE this **9th** day of **September, 2011.**

                              **/s/  SONJA F. BIVINS**
                        **UNITED STATES MAGISTRATE JUDGE**

**MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS AND
RESPONSIBILITIES FOLLOWING RECOMMENDATION, AND
<u>FINDINGS CONCERNING NEED FOR TRANSCRIPT</u>**

l.   ***Objection***.   Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this court.   Failure to do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the Magistrate Judge.   See 28 U.S.C. § 636(b)(1)(C); *Lewis v. Smith*, 855 F.2d 736, 738 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. Unit B, 1982) (*en banc*).   The procedure for challenging the findings and recommendations of the Magistrate Judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a 'Statement of Objection to Magistrate Judge's Recommendation' within ten days[16] after being served with a copy of the recommendation, unless a different time is established by order.   The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.   The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed de novo and a different disposition made.   It is insufficient

_____

[16] Effective December 1, 2009, the time for filing written objections was extended to "14 days after being served with a copy of the recommended disposition[.]"   Fed. R. Civ. P. 72(b)(2).

to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.   Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.   ***Transcript (applicable Where Proceedings Tape Recorded).*** Pursuant to 28 U.S.C. § 1915 and FED. R. CIV. P. 72(b), the Magistrate Judge finds that the tapes and original records in this case are adequate for purposes of review.   Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

DONE this **9th** day of **September, 2011.**

<u>     /s/ SONJA F. BIVINS     </u>
**UNITED STATES MAGISTRATE JUDGE**